# United States District Court

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

MELVIN RUTH

**CRIMINAL COMPLAINT**

CASE NUMBER: 00-4083-BSS

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __April 17, 2000__ in __Broward__ County, in the __Southern__ District of __Florida__ defendant did, (Track Statutory Language of Offense) (describe)

knowingly and willfully devise, intend to devise a scheme or artifice to defraud for obtaining money, property by means of false, fraudulent pretenses, representations or promises, and for the purpose of executing such scheme and artifice to defraud, caused to be placed in any post office or authorized depository for mail matter, letters including contracts and account customer information, to be delivered by mail and also as part of this scheme and artifice to defraud, to obtain money by means of false and fraudulent pretenses, representations, caused to be transferred by means of a wire communication, money wire transfers in interstate commerce.

in violation of Title __18__ United States Code, Section(s) __1341 & 1343__

I further state that I am a(n) __Special Agent, Federal Bureau of Invest.__ and that this complaint is based on the following facts:

Official Title

Please see attached affidavit.

Continued on the attached and made a part hereof: [x] Yes [ ] No

Signature of Complainant
Stefan Nass, Special Agent
Federal Bureau of Investigation
04/17/2000

The Court finds probable cause.
Sworn to before me, and subscribed in my presence,

April 17, 2000 at Fort Lauderdale, Florida
Date    City and State

BARRY S. SELTZER,
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer    Signature of Judicial Officer

AFFIDAVIT

I, Steffan Nass being duly sworn, deposes and states:

1. I am employed as a Special Agent with the Federal Bureau of Investigation (FBI), Miami, Florida. I have been employed as a Special Agent with the FBI since June 1996. I am currently assigned to a white collar crime squad investigating illegal telemarketing operations, commonly known as "boiler rooms", and other violations of the federal mail and wire fraud statutes. I have had training, both formal and informal, in white collar crime investigations.

2. This affidavit is submitted in support of an application for the issuance of an arrest warrant for the following individual, having committed offenses in the Southern District of Florida:

>  Melvin D. Ruth
>  SSAN: 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
>  DOB: 01/23/1941

As explained below, there is probable cause to believe that this individual violated federal criminal law.

3. Because this affidavit is provided for the limited purpose of establishing probable cause to support an arrest warrant, I have not included details of all aspects of this investigation, but rather, have set forth only those facts that I believe are necessary to establish probable cause. The information in this affidavit is based upon my personal knowledge as well as information I have obtained from victims, a former employee (hereinafter "CS1") of BARCLAYS FINANCIAL GROUP (hereinafter "BFG") and BARCLAYS MANAGEMENT GROUP (hereinafter "BMG") and a former employee of BFG, BMG and CHASE CAPITAL MANAGEMENT GROUP, INC. (hereinafter "CHASE"), a cooperating witness (hereinafter "CS3"), a Federal Bureau of Investigation Undercover Agent (hereinafter "UCA"), audio tape recordings and from a review of

1

documentary materials, including those recovered following the execution of a federal search[1] warrant at CHASE'S offices in Ft. Lauderdale, Florida, Hollywood, Florida, and Newport Beach, California..[1]

4.  CS1 was employed at BFG and BMG. CS1 was involved in the daily operations of both companies. CS1's primary responsibility was to prepare the account statements for clients and forward said statements to the clients via the United States Mail. CS1 also established the Internet Website for BMG. CS2 was employed as the only foreign currency exchange market trader at CHASE. CS2 prepared the "equity runs" used to track the status of customer accounts AND had daily contact with MELVIN RUTH, the owner of BFG, BMG and Chase. CS3 worked formerly with RUTH at another telemarketing foreign currency exchange "boiler room." RUTH believed CS3 was in a position to enter into a partnership with him at CHASE and spoke freely with CS3 about the operation.

5.  I believe there is probable cause to believe that RUTH, through his companies, BFG, BMG and CHASE obtained monies through false statements, fraudulent pretenses, representations, or promises, utilizing the mails and wire communications in violation of 18 U.S.C. section 1341 (mail fraud) and 18 U.S.C. Section 1343 (wire fraud).

## BACKGROUND

6.  On or about January 27, 2000, Special Agents of the Miami Field Office of the FBI initiated an investigation of BMG, located at 1920 Coral Way, Miami, Florida. BMG was a State of Florida registered corporation (originally filed on September 17, 1999) soliciting individuals to

---

[1] On March 15, 2000, U.S. Magistrate Seltzer authorized a federal search warrant for the records of Chase Capital Management.

invest in the foreign currency exchange market. BMG formerly operated as BFG. BFG was a State of Florida registered corporation (originally filed on May 7, 1999). BFG ultimately reorganized and began operating jointly as BFG and BMG. BFG and BMG ultimately ceased operating in Miami and reorganized as CHASE. On January 11, 2000, CHASE was formed as a Florida Corporation. Investigation has revealed that BFG, BMG and CHASE sales representatives made representations to investors that were false and/or fraudulent for the purpose of defrauding customers of their money.

OPERATION

7. I have reviewed corporate documents filed with the State of Florida, documents recovered following the execution of aforementioned search warrants, victim complaints of BMG and CHASE, numerous audio recordings between CS3 and RUTH, BMG web site information found on the Internet (at BARCLAYSTRADING.COM), CHASE sales pitch documents, and conducted interviews with CS1, CS2, CS3 and the UCA. A synopsis of BFG/BMG/CHASE'S modus operandi is as follows:

    a.    BFG/BMG/CHASE solicited investors primarily through print media advertisements.

    b.    Interested investors called BFG/BMG/CHASE and left their name and telephone number either on an answering machine or with an employee at BFG/BMG/CHASE. They were then informed a sales representative will return their call.

    c.    Interested investors then received a call from a BFG/BMG/CHASE sales representative, referred to as a "fronter." "Fronters" were the first line of sales representatives who recited a scripted sales presentation, also known as a "pitch", to the customer. The "fronters" gave a brief introduction into the foreign currency exchange market, advising the customers of the

substantial profits they can make. Also included in the "pitch" are misrepresentations meant to entice customers to invest with BFG/BMG/CHASE. No mention is made to investors that only a portion of their money will ever be invested in the market, leading customers to believe all of their money is being invested. Customers are also told that they will be charged $100.00 on each investment made on their behalf. Customers were sent contracts via the U.S. Mail and or Federal Express and received account statements through the U.S. Mail. Customers then send checks, via Federal Express, or wire their money to BFG/BMG/CHASE.

   d. On or about March 7, 2000, the UCA, posing as an investor, conducted a consensually recorded telephone call with an individual identifying herself as JUDY BARNES, an employee at CHASE. BARNES advised the UCA that CHASE has been in operation for ten (10) years and that she has been employed there for two (2) years. BARNES identified "MEL RUTH" as the owner of CHASE and advised the UCA that RUTH has owned CHASE for several years. BARNES also told the UCA that CHASE employs two traders who watch the market twenty-four hours each day (two twelve hour shifts). In addition, BARNES told the UCA that CS2 was formerly employed as a trader for CITIBANK. BARNES made no mention of the fact that only a portion of the UCA's investment would ever be invested and traded.

   e. Typically after a customer made an initial investment, the customer was recontacted by the "fronter" or by a higher level salesperson known as a "loader." A "loader" is a salesperson responsible for convincing the customer that he/she needs to invest additional money with BFG/BMG/CHASE. Customers are told that their account is "up" and are asked to invest additional funds.

   f. To date, a review of records subpoenaed from MG CORPORATION, the Internet foreign currency trading company used by RUTH, and several banks used by RUTH to

4

receive investor funds, indicated that only $7,500.00 of the approximately $1,000,000.00 invested by customers has been forwarded to the foreign currency market trading account used by BFG/BMG/CHASE. In addition, a review of the records indicates that no funds have ever been transferred from the foreign currency trading account to any customer of BFG/BMG/CHASE. A majority of the funds withdrawn from the banks were taken out by RUTH through checks to cash.

    g. On or about March 3, 2000, a "script" was recovered from the trash at one of CHASE'S offices. Similar "scripts" were recovered during the execution of the search warrants on March 15, 2000. The "script" instructed the "loader" to advise the customer that, "I can see you just came into the market and I see your account is already up." In interviews with investors with BMG/CHASE, each investor stated that they were initially advised by representatives that their account was "up." However, once the investors requested to close their accounts they were notified that they had lost nearly all of their money. Investors would then receive an account statement indicating their account was depleted. None of the investors interviewed have been able to close their account, nor have any received back their initial investment.

    8. On or about March 7, 2000, and continuing thereafter, CS2 was interviewed by the writer. CS2 advised he/she was the foreign currency investment market trader for CHASE. He/She handled all trades and prepared all customer financial statements for CHASE. The "fronters" for CHASE operate out of an office located at 2701 West Oakland Park Boulevard, Suite 410, Ft. Lauderdale, Florida. CS2 advised that he/she was instructed by RUTH, CHASE'S owner, as to how to complete customer's "equity runs" based upon the trade(s) he/she conducted. CS2 stated that the amount he/she credits/debits to a given customer's account does not represent an amount actually gained/lost by a customer, but rather, exists only on paper. The "equity runs" are updated after each trade and are used at CHASE to track the status of a customer's account. CS2 is

also responsible for mailing, via FEDERAL EXPRESS, the "Welcome Packets" to the new customers.

9.  In or about February 2000, CS3 began conducting a series of meetings with MELVIN RUTH. Each of the meetings were recorded by CS3. A brief synopsis of portions of the meetings, relevant to this Affidavit, between CS3 and RUTH is as follows:

a.  On February 8, 2000, CS3 met with MELVIN RUTH and GREGORY SWARN. During the meeting RUTH advised CS3 that he and SWARN had recently begun operating a foreign currency exchange investment firm on Oakland Park Boulevard. RUTH explained that the firm solicits investments in the foreign currency market, but invests only 20% of the money it receives. The remaining 80% is split between himself and SWARN.

b.  On February 11, 2000, CS3 met with RUTH. During the meeting RUTH advised CS3 that CHASE formerly operated as BMG and he was in the process of changing the BMG website to represent his new company, CHASE. RUTH also advised CS3 that all investments with CHASE are deposited into an account at a local bank, after which RUTH transfers a portion of the funds received into a trading account. All information regarding the opening of an account is then faxed to the trader (CS2). RUTH identified CS2 as the individual responsible for conducting all trades. CS2 also maintains records of all account balances for investors with CHASE. During the meeting CS3 accompanied RUTH to RUTH'S office located at 2445 Hollywood Boulevard, Suite 108, Hollywood, Florida. RUTH advised CS3 that 1031 Ives Dairy Road, Miami, Florida, the address given to customers as CHASE'S operating address, was maintained by CHASE simply as a "mail drop." Upon leaving 2445 Hollywood Boulevard, Suite 108, Hollywood, Florida, CS3 accompanied RUTH to 2701 West Oakland Park Boulevard, Suite 410, Ft. Lauderdale, Florida. RUTH and CS3 were observed, and photographed, entering the

building at 2701 West Oakland Park Boulevard, Ft, Lauderdale, Florida. While inside Suite 410, CS3 observed RUTH distribute payroll checks to his employees. RUTH explained to CS3 that the office had been in operation for two months.

        c.    On February 15, 2000, CS3 met with RUTH. RUTH advised that CS2 has an office at home from which he does the trading. RUTH further advised that CS2 also did sales and trading at BMG. In addition, RUTH described to CS3 the process in which all proceeds are split between himself and SWARN each week. RUTH stated that CHASE currently advertises in the USA TODAY as well as several regional newspapers.

<u>VICTIMS</u>

10.    On February 14, 2000, your affiant interviewed, via telephone, MARTHA POWERS. POWERS resides in Ninety-six, South Carolina. POWERS advised that in the fall of 1999 she was contacted, by telephone, by an employee of BMG. On 11/16/1999, following several conversations with the employee during which POWERS was told an investment in the foreign currency market with BMG was "almost a sure thing", POWERS invested $5,000.00 with BMG. POWERS was later recontacted by the same employee. He advised POWERS that her account had increased in value and suggested she invest further funds. POWERS consented, and on 11/24/1999 she invested an additional $5,000.00. In early 2000, POWERS was contacted by an individual identifying himself as WILLIAM BUHLER, a trader at CHASE. BUHLER explained that he was now handling POWERS' account and suggested she invest additional funds. POWERS agreed and on 01/14/2000 she invested an additional $8,000.00 with BMG. CS1 and CS2 each advised that WILLIAM BUHLER is a "phone name" used by RUTH. A review of records received from NATIONSBANK, N.A. and REPUBLIC SECURITY BANK indicate that on the aforementioned dates, funds were wire transferred from POWERS' bank and investment

7

accounts in South Carolina to BMG accounts in Florida. A review of records received from MG CORPORATION reveals that no corresponding transfers of funds were made into the BFG/BMG/CHASE trading account on behalf of POWERS. To date POWERS has been unable to close her account with BMG and has not received any funds from them.

    11.    On March 30, 2000, your affiant interviewed, via telephone, MICHAEL PINTILIE. PINTILIE resides in Arvada, Colorado. PINTILIE advised that in late 1999 he was contacted by an employee of CHASE and persuaded to invest in the foreign currency market with CHASE. PINTILIE was told that CHASE had been trading in the market "for a long time, many years." On February 23, 2000, PINTILIE wire transferred $6,000.00 from his personal bank account in Colorado to a CHASE account in Florida. PINTILIE was later contacted by another employee at CHASE and pressured to invest additional funds. On February 25, 2000, PINTILIE wire transferred $10,000.00 from his personal bank account in Colorado to a CHASE account in Florida. A review of records received from MG CORPORATION reveals that no corresponding transfers of funds were made into the BFG/BMG/CHASE trading account on behalf of PINTILIE. To date PINTILIE has been unable to close his account with CHASE and has not received any funds from them.

    12.    On February 18, 2000, your affiant interviewed ANNIE KIMMELL. KIMMELL resides in Las Vegas, Nevada. KIMMELL advised that in early 2000, she contacted BMG seeking information about investing in foreign currency. After speaking with an employee at BMG KIMMELL agreed to invest $20,000.00. However, the following day KIMMELL contacted the same employee at BMG and advised him that she would like to invest only $10,000.00. KIMMELL was told that an account for $20,000.00 had already been opened in her name and thus she was obligated to invest the entire $20,000.00. KIMMELL ultimately wire transferred

$20,000.00 from her personal bank account to a BMG account in Florida. Records received from REPUBLIC SECURITY BANK reveal that on January 5, 2000, BMG received a $10,000.00 wire transfer from KIMMELL and a second $10,000.00 transfer was received on January 6, 2000. A review of records received from MG CORPORATION reveals that no corresponding transfers of funds were made into the BFG/BMG/CHASE trading account on behalf of KIMMELL. To date KIMMELL has been unable to close her account with BMG and has not received any funds from them.

13. Your affiant has interviewed other victims, who have also advised they suffered similar losses to date. Your affiant believes based on review of the records obtained to date the loss to investors as a result of this fraud are approximately $ 1,000,000.

CONCLUSION

15. For the reasons set forth above, there is probable cause to believe that the operation of BFG/BMG/CHASE by RUTH constitutes a scheme to defraud that includes violations of 18 U.S.C. section 1341 and 18 U.S.C. section 1343.

STEFFAN NASS, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed
to before me this ___ day
of April, 2000, at
Ft. Lauderdale, Florida

BARRY SELTZER
UNITED STATES MAGISTRATE JUDGE